UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD DAVID MARTIN,

                          Petitioner,                    Case No. 2:11-cv-15034
                                                         Hon. Victoria A. Roberts
v.

RANDALL HAAS,[1]

                          Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS AND , (2) GRANTING A CERTIFICATE OF APPEALABILITY WITH RESPECT TO PETITIONER'S FIRST ALLEGATION OF INEFFECTIVE ASSISTANCE OF COUNSEL AND HIS RIGHT TO PRESENT A DEFENSE CLAIM**

This is a habeas case brought by a Michigan prisoner through counsel under 28 U.S.C. § 2254. Ronald David Martin, ("Petitioner"), was convicted after a jury trial in the Oakland Circuit Court of five counts of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b, and four counts of second-degree criminal sexual conduct. MICH. COMP. LAWS § 750.520c. Petitioner was sentenced to five concurrent terms of 15 to 30 years for the first-degree convictions and four concurrent terms of 8 to 15 years for the second-degree convictions.

The petition and supplemental brief assert six grounds for relief: (1) Petitioner's trial counsel was ineffective for failing to renew a motion to present defense evidence after the trial court reserved its pretrial ruling, (2) counsel failed to secure the victim's medical records, (3) counsel failed to present expert testimony on the characteristics of child sexual abuse victims, (4) counsel

_____

[1]Petitioner has been transferred to the Macomb Correctional Facility.  The only proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated habeas petitioner is the warden of the facility where the petitioner is incarcerated. *See Edwards Johns,* 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *See also* Rule 2(a), 28 U.S.C. § 2254.  Therefore, the Court substitutes Warden Randall Haas the caption.

failed to object to inadmissible hearsay, (5) the trial court violated Petitioner's rights to present a defense and to confrontation by excluding evidence regarding the victim's prior sexual history, and (6) the trial court incorrectly scored the sentencing guidelines. Respondent asserts that Petitioner's first claim is barred by the statute of limitations, and that all of Petitioner's claims were reasonably adjudicated by the state courts.

The Court finds that Petitioner's claims are without merit; the petition is denied. The Court will, however, grant Petitioner a certificate of appealability with respect to his first allegation of ineffective assistance of counsel and his right to present a defense claim.

## I. Background

The charges against Petitioner stemmed from allegations that he engaged in a sexual relationship with his minor daughter, Samantha, February through August of 2008, when she was fifteen years old.

Prior to trial, Petitioner's counsel moved to admit evidence that the under-aged victim was engaged in a sexual relationship with a young man named Steven who was three or four years older than her, and Petitioner threatened to inform the police. See Dkt. 6-13. At a pretrial hearing held on the motion defense counsel asserted that the evidence of the sexual relationship was admissible to show Samantha's motive for making a false charge in retaliation for her father's threat. Dkt. 6-3, at 3-6. Defense counsel suggested that the parties enter into a stipulation that Samantha had sexual contact with Steven and that Petitioner threatened to inform the authorities. Id., at 6-7. The prosecutor did not object to evidence that Petitioner had a "father-daughter talk" about engaging in sexual relations at her age and her defiant reaction, but she objected to the introduction of evidence that Samantha in fact engaged in sexual activities with Steven. Id., at 7-9. The trial court took the matter under advisement. Id., at 13. The court subsequently issued a written order stating that the

motion was "denied without prejudice. The Court will revisit the issue after hearing the prosecution's evidence at trial." Dkt. 11. Nevertheless, neither the trial court nor defense counsel raised the issue again at trial.

With respect to the evidence presented at trial, this Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> The complainant was age 16 at the time of trial in May 2009. Martin is the complainant's father. He and the complainant's mother were never married and do not live together. The complainant lives with her mother and would normally visit her father on weekends. The complainant testified that the first time Martin did something inappropriate to her was in mid-January to early-February 2008. She stated that he grabbed the front of her pants and pulled her towards him. Later in February, Martin came into the room of the complainant's sister where the complainant was watching television, laid down next to her, and began touching her breasts on top of her bra. He eventually stopped but stayed in the bed with her. The complainant acknowledged that there were other beds available, but she stayed in the bed with Martin. At the end of February, she told her friend, OR, about this incident.

> In March or April 2008, Martin, the complainant, and her younger sister stayed at a Holiday Inn. The complainant testified that, just after her sister left the room to go to the swimming pool, Martin took the complainant by the arms and pulled her towards him. The front of their bodies touched, and he tried to kiss her. Later that night, Martin lay down next to the complainant while her sister was in the other bed. He touched the complainant's breasts underneath her bra, put his hand down her shorts, and digitally penetrated her vagina. Martin then followed her into the bathroom, took off her shorts and his boxers, put her on the counter, and penetrated her vagina with his penis.

> On cross-examination, the complainant testified that Martin had been in the bathroom and as he was walking out, she was walking in, and he then followed her back in. However, her testimony at the preliminary exam indicated that he had not been in the bathroom first. In a prior statement given to Amy Allen at Care House, the complainant said that she and her sister were in the same bed, that Martin moved her sister to the other bed, and then he got in bed with the complainant and penetrated her. She explained the discrepancy by saying that she must have mixed up the events. She acknowledged that she continued to visit Martin after the hotel incident, even though she was afraid he might rape her again, because she still wanted to see her dad.

During the summer of 2008, Martin was going through a divorce and began living with his brother, Don Martin. Martin occupied the guest bedroom in Don Martin's house. When the complainant stayed overnight with Martin, they slept in the same bed. The complainant said that she could not sleep on the couch because it hurt her back. On one occasion, she got into bed after Martin was already in bed. He touched her breast underneath her bra. She claimed that he then removed her shorts and asked her to remove her shirt. When she declined to do this, Martin took off his boxers and then penetrated her vagina with his penis.

Also during the summer of 2008, while the complainant was staying at her grandmother's house, Martin followed her into the bedroom and touched her breast underneath her bra. She initially said that he stopped and left when her sister came into the room to go to bed. On cross-examination, however, she said that he stayed in the room after her sister got in bed and resumed the inappropriate touching after her sister went to sleep. Also, she contradicted herself with regard to the timeframe, stating that this happened at the end of Spring 2008.

The complainant testified that, on a subsequent occasion at Don Martin's house, Martin joined her while she was in the shower. He pulled her towards him and his chest was touching her breasts. He asked if she wanted him to get out; he left when she said yes. She then finished her shower. When she went to the bedroom to get dressed, he was also getting dressed. At that moment, her sister called, asking to be picked up. After the phone call, Martin penetrated the complainant's vagina with his penis. This time he wore a condom. On cross-examination, the complainant said that she got dressed in the bedroom, whereas at the preliminary examination she said that she got dressed in the bathroom. Also, she said that Martin was in the kitchen when she initially entered the bedroom. She also stated that he stopped because of the phone call.

Toward the end of August 2008, the complainant went to a birthday party with Martin and then returned to Don Martin's house with him. She got in bed, and Martin joined her. She claimed that he then penetrated her vagina with his penis. Although she saw Martin after this incident, this was the last time the abuse occurred. The complainant had previously told Amy Allen of Care House that everything started after Martin moved in with Don Martin. She also told Allen that two of the rapes occurred in her bunk bed. The bunk bed arrived at Don Martin's house in August 2008.

In October 2008, the complainant told her boyfriend, CH, about what happened. Two days later, she told her best friend, OR, the full story as well. The complainant said that she finally told someone because she did not want to have to keep visiting Martin and did not want the same thing to happen to her sister. She could not explain why she waited until October. She said that OR told her she had to tell someone about the abuse. They decided to tell OR's mother, CR. CR is also the complainant's godmother. OR was the one that actually told CR about what

happened, but the complainant responded to questions. The three of them then told the complainant's mother.

On cross-examination of the complainant, defense counsel established that she had incorrectly told her mother that all four incidents of intercourse happened at Don Martin's house. Further, defense counsel established that during the time period of the assaults, the complainant had visited Martin more often than she previously had. The two of them had done many activities together, such as going to Cedar Point and Michigan Adventure. Although the complainant claimed that she went to Don Martin's home to see her sister, she stayed even when her sister was not there. Also, the complainant chose to stay with Martin even though she had the option to go to her grandmother's house. The complainant had also testified on Martin's behalf when a personal protection order was sought regarding visitation rights for her sister.

Further, defense counsel established that, in October 2008, Martin had refused the complainant's request that she be put on his cell phone plan. She made her allegations of sexual abuse shortly after their argument. The complainant wanted to be on Martin's phone plan because it would have been easier and cheaper to talk to her friends. She claimed that he put her off, saying that he would wait to look at her grades. Despite this testimony, the complainant maintained that, other than the touching and rapes, there was nothing that was making her angry with Martin during the relevant period.

In his affidavit, Martin claimed that he agreed to put the complainant on the cell phone plan if her grades improved and she stopped seeing SC. Martin claimed that SC, 18 years old at the time, was having sexual relations with the complainant. Martin and the complainant got into numerous arguments over her relationship with SC. In the spring of 2008, Martin told the complainant that he did not approve of her seeing SC. In the summer of 2008, Martin again told the complainant not to see SC anymore. Martin also threatened to report SC to the police if the complainant did not stop seeing him. Martin made a similar threat at the end of the summer of 2008. Before trial, Martin sought to have evidence of the complainant's relationship with SC admitted into the record. But the trial court precluded the evidence on the basis of the rape shield law.

The complainant's mother testified that the complainant was upset and crying when she told her about what was happening with Martin. Her mother said that the complainant had told her that sexual intercourse had occurred on four occasions, each time at Don Martin's house. She said that during the relevant time period, the complainant would insist on going to Don Martin's home. The complainant never indicated that she did not want to go. After the complainant's disclosure regarding the abuse, her mother took her to see her pediatrician, Dr. Stacy Gorman.

Dr. Gorman testified that the complainant told her that Martin had forced her to have sexual intercourse four times since February 2008. Dr. Gorman took a patient

history, which she said was necessary for treatment to know what happened and who was responsible. Dr. Gorman subsequently recommended counseling for the complainant. However, she did not perform a pelvic examination on the complainant. She explained that she did not perform a pelvic examination because the complainant had already had one in August 2008. Dr. Gorman further explained that she did not feel the need to repeat the exam because the complainant told her that August was the last time any sexual abuse had occurred.

After seeing Dr. Gorman, the complainant went to the Waterford Police Department and then to Care House, where Amy Allen conducted a forensic interview. Without objection, Allen was qualified as an expert in forensic interviewing, as well as on characteristics of children who report sexual abuse. Allen stated that she followed a forensic interviewing protocol that involved open-ended questions. In essence, she testified that it was not unusual for adolescents to delay reporting sexual abuse by a family member. Further, she said that it would not be unusual if one did not see outward signs of abuse. She also said it would not be unusual for a victim to show no fear. She explained that compliance might result because of the body's response to the abuse or because the child did not know how to make it stop. Allen also said that a child might return to the abuser because of a desire to protect someone else and might stay even if the person to be protected is not present because of compliance with the abuser. She explained that people change details when remembering traumatic events. Further, she said that a victim's motivating factor in reporting abuse was most often to make it stop, not trigger prosecution.

On cross-examination of Allen, defense counsel established that there were some similarities among child sexual abuse victims. Defense counsel further established that the complainant had not run away from home, did not use drugs, did not have poor hygiene, and was not underweight or overweight. Allen clarified, however, that an abused child could have really poor or extremely good hygiene, and really poor or extremely good grades. Allen did not know if the complainant suffered from low self-esteem. Defense counsel called into question that a 14-or 15-year-old child would withhold reporting abuse because he or she was close to independence. Further, defense counsel ascertained that Allen was not assessing truthfulness. Allen told the defense counsel that, in embellishing a story, a 15-year-old child would likely focus on what should have been done, like fighting the molester. Allen also acknowledged that inconsistent stories might result from blending events or from outright lying. Further, defense counsel established that Allen could not tell the difference between when a child was lying and when a child was changing the story based on more legitimate factors.

On a redirect examination, Allen testified that an investigator tries to develop alternative explanations for why a child is making the statement. She explained that when younger children are involved, an alleged touching could be for hygienic purposes. Allen did not speak to alternative hypotheses in this case. Yet, she

explained that her team ruled out any alternative hypotheses for the complainant.

*People v. Martin*, No. 293129, 2011 WL 445806, at *1-4 (Mich. Ct. App. Feb. 8, 2011).

Based on this evidence the jury found Petitioner guilty of the charges indicated above. After sentencing, Petitioner retained appellate counsel who filed a motion for new trial, asserting that Petitioner was denied the effective assistance of trial counsel. Among other arguments, the motion alleged that trial counsel ineffectively presented his  pretrial motion to admit evidence of Samantha's sexual relationship with Steven and Petitioner's resultant threat. The motion also asserted that the trial testimony of Samantha's physician, Dr. Gorman, and the Care House worker, Amy Allen, created a new basis that defense counsel should have used to renew his motion for presentation of the defense evidence.

On January 5, 2010, the trial court issued an opinion and order denying the motion for a new trial. The court found that trial counsel adequately and effectively presented his pretrial motion. In denying relief, the trial court suggested that it would have denied any renewed motion to admit the defense evidence, stating "[t]he Court ultimately denied the motion. The record shows that trial counsel made every effort to persuade the Court to admit evidence of Samantha's prior sexual conduct. Defendant has not shown seriously deficient conduct by his trial [counsel] and that he was prejudiced by the same." Dkt. 6-19, at 2-3.

Petitioner then filed a brief in the Michigan Court of Appeals, raising the following claims:

I. [Petitioner] was deprived of the effective assistance of counsel where defense counsel failed to litigate fully or properly request to introduce evidence excepted under the rape shield statute; where counsel failed to secure complainant's medical records; where counsel failed to secure the testimony of a responsive expert on the issue of the characteristics of child sexual abuse victims; and where counsel failed to object to inadmissible hearsay.

II. The trial court's pre- and post-trial rulings rejecting [Petitioner's] rape shield challenge were an abuse of discretion, and deprived [Petitioner] of his right to

confront the witnesses and the right to present a defense, where the court excluded material evidence of the complainant's sexual history and motive to fabricate despite the prosecution's introduction of medical testimony of the complainant's earlier pelvic examination and expert testimony that the Care House "team" had ruled out alternative hypothesis for the complainant's allegations.

III. The trial court erroneously scored OV8, OV13, and PRV7, and also violated [Petitioner's] due process rights at sentencing by scoring the guidelines for reasons not proven to the jury beyond a reasonable doubt, in violation of the Sixth and Fourteenth Amendments.

The Michigan Court of Appeals issued an unpublished opinion affirming Petitioner's convictions. *Martin*, 2011 WL 445806. With respect to Petitioner's first and second allegations of ineffective assistance of counsel, the court found that Petitioner failed to demonstrate deficient performance because "there is no indication that a renewed motion would have been successful. In fact, the trial court's opinion implies that it would have denied a renewed motion. Accordingly, defense counsel was not ineffective, either for his initial arguments or for failing to renew the motion." *Id.*, at *6. The court also rejected Petitioner's other claims of ineffective assistance of counsel on the merits. *Id.*, at *6-8.

With respect to Petitioner's right to present a defense claim, the court found that the defense evidence would have been barred by Michigan's rape-shield law: "While evidence of the complainant's sexual past may have developed an alternative hypothesis [for the complaint's claims against Petitioner], such evidence is precluded by the rape shield law, and Martin has failed to show sufficient cause to circumvent the statutory prohibition." *Martin*, 2011 WL 445806, at *8.

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed. *People v. Martin*, 489 Mich. 975 (2011) (table).

Petitioner then filed this action, raising the same three claims he presented to the state courts

during his direct appeal. Respondent filed a responsive pleading. Neither party took notice of the fact that the trial court's pretrial order denying the motion to admit the defense evidence was denied without prejudice, or that the trial court stated that it would reconsider the matter during trial after the prosecutor rested. The Court issued an Opinion denying the petition on the merits, but it noted the mistaken assumption that the trial court had denied the pretrial motion with prejudice. See Dkt. 14.[2]

Confronted with this new basis for an ineffective assistance of counsel claim, i.e., counsel's failure to renew the motion because the trial court stated it was reserving its ruling, Petitioner filed a motion for reconsideration and a motion to hold the case in abeyance so he could return to the state courts and present this new claim to the state courts. See Dkt. 15. The Court vacated the order denying the petition, and granted Petitioner's motion to hold the case in abeyance while he returned to state court. See Dkt. 19.

Petitioner then returned to the state trial court and filed a motion for relief from judgment raising his new allegation of ineffective assistance of counsel. The trial court denied the motion on the basis of Michigan Court Rule 6.508(D)(2), finding that it could not review the claim because it had been raised on direct appeal. See Dkt. 24-4, at 2. The court reasoned:

> During oral argument on the [pretrial] motion, defense counsel argued that complainant was sexually active with an older boy named "Steven," that because of Samantha's age it was illegal. In arguing the motion, defense counsel asserted that Defendant had confronted complainant about it and told her that if she did not stop having sex he would call the police, which created a motive for Samantha to lie. Defense counsel argued that Defendant's brother was prepared to testify that Defendant confronted complainant this way. The Court took the motion under advisement and later issued a written order denying the motion. The order stated that the ruling was "without prejudice. The Court will revisit the motion after hearing the

[2]This case was previously assigned to Hon. Gerald E. Rosen, who issued the Court's earlier opinion. The case was reassigned to the undersigned after Judge Rosen's resignation.

prosecutor's evidence at trial." defendant counsel did not request that the issue by revisited during trial.

> In his appeal, Defendant argued he was deprived of the effective assistance of counsel where defense counsel failed to litigate fully or properly a request to introduce evidence excepted under the rape shield statute. The Court of Appeals addressed this argument and found no merit. Defendant argued the defense counsel should have renewed the motion again following Dr. Gorman's and Amy Allen's testimonies. The Court of Appeals addressed this argument and found defense counsel was not ineffective either for his initial arguments or for failing to renew the motion. Thus, the grounds for the instant motion were previously decided against Defendant in his prior appeal and this Court cannot grant the relief requested.

Id., at 3-4.

Petitioner then filed a delayed application for leave to appeal to the Michigan Court of Appeals, but it was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Martin*, No. 324098 (Mich. Ct. App. March 12, 2015). Petitioner filed an application for leave to appeal to the Michigan Supreme Court, but it was also denied under Rule 6.508(D). *People v. Martin*, 872 N.W.2d 448 (2015).

Petitioner then returned to this Court and filed a motion to reopen the case. Dkt 20. The Court granted the motion. Dkt. 21. The parties filed supplemental pleadings, and the matter is now ready for decision.

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that

are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

### III. Analysis

A. Statute of Limitations

Respondent argues that review of Petitioner's first allegation of ineffective assistance of counsel is barred by expiration of the one-year statute of limitations under 28 U.S.C. § 2244(d). Respondent asserts that the newly raised claim does not relate-back to the filing of the original petition because it is not "tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005). The Court finds it unnecessary to address this procedural question. The statute of

limitations is not a jurisdictional bar to review of the merits, *Smith v. State of Ohio Dept. of Rehabilitation*, 463 F. 3d 426, 429, n.2 (6th Cir. 2006), and "federal courts are not required to address a procedural . . . issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Accordingly, the Court will proceed to the merit's of Petitioner's claims.


B. Right to Present a Defense and to Confront Witnesses

The Court begins with Petitioner's claim asserting a violation of his right to present a defense and to confront witnesses; if the Court resolves this claim in favor of him, it also disposes of his first allegation of ineffective assistance of counsel. Petitioner asserts these constitutional rights were violated when he was prevented from presenting evidence of Samantha's sexual relationship with Steven, and that Petitioner's warning that he would report the relationship created a motive for Samantha to falsely accuse him.

While the trial court did not make a final ruling on the issue before or during trial, the trial court suggested that it would have denied a renewed motion when it denied Petitioner's motion for a new trial. Dkt. 6-19, at 2-3. Furthermore, when the Michigan Court of Appeals reviewed this claim during Petitioner's appeal of right it found that the evidence was precluded under Michigan's rape shield law. *Martin*, 2011 WL 445806, at *8.

Because it is nevertheless unclear whether the state courts adjudicated Petitioner's *constitutional* claims on the merits, an argument can be made that the deferential standard of review under § 2254(d)(1) does not apply. Nevertheless, even assuming that the claim is subject to de novo review, Petitioner's claim is without merit.

A criminal defendant has a constitutional right to cross-examine witnesses and to present

defense evidence. This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); See also *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'") (internal citations omitted). However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). Rules that exclude evidence from criminal trials do not violate the right to present a defense unless they are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998)(quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). Moreover, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about, among other things, interrogation that is repetitive or only marginally relevant. "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

Opposing a criminal defendant's right to present a defense and to confront witnesses is the government's interest in protecting the privacy of sexual assault victims. Indeed, it is undisputed that legitimate governmental interests support the enforcement of Michigan's Rape Shield Statute. Mɪᴄʜ. Cᴏᴍᴘ. Lᴀᴡs § 750.520j. The Supreme Court noted that this very statute "represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy." *Michigan v. Lucas*, 500 U.S. 145, 150 (1991).

The government's interest in excluding evidence of prior sex acts under the rape-shield law is particularly strong where the victim is a minor. See *United States v. Ogden*, 685 F.3d 600, 606 (6th Cir. 2012) (finding Federal Rule of Evidence 412's protections "especially important" for underage victims). Sometimes the right of a criminal defendant to present relevant testimony therefore must "bow to accommodate other legitimate interests," such as the privacy rights of victims of sexual abuse. *Id*. *Lucas*, 500 U.S. at 149.

Under the rape shield law, evidence of specific instances of a victim's past sexual conduct with others is generally legally irrelevant and inadmissible. *Wimbley v. Sherry*, No. 2:06-CV-265, 2009 U.S. Dist. LEXIS 101110, 2009 WL 3644808, at *3 (W.D. Mich. Oct. 30, 2009) (citing *People v. Arenda*, 416 Mich. 1 (1982)). This is because inquiries into a victim's sexual history, even when minimally relevant, carry a danger of unfairly prejudicing and misleading the jury. *Id*. The proposed defense evidence in this case fell within the rubric of the rape shield law.

Courts are directed to weigh these competing interests to determine whether the Constitution permits exclusion or demands admission of defense evidence subject to a rape shield law. See *Gagne v. Booker*, 680 F.3d 493, 514 (6th Cir. 2012) (en banc plurality) (court must balance a state's interest in excluding evidence under the rape shield statute against a defendant's constitutionally protected interest in admitting the evidence on a case-by-case basis—neither interest is superior per se). Considerations for determining where the balance lies include: (1) the potential for distracting "minitrials" on collateral issues, especially the victim's sexual history; (2) the probative value of the testimony; (3) its "prejudicial or inflammatory nature"; (4) any cautionary instructions or limits on the scope of questioning; and (5) the extent to which the defendant was otherwise able to cross-examine the witness. *Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 595 (6th Cir. 2012) (internal quotation marks and citations omitted); see *Lucas*, 500 U.S. at 149 (discussing the

need to avoid "harassment, prejudice, confusion of the issues . . . or interrogation that is repetitive or only marginally relevant").

A careful review of the record shows that the probative value of the excluded defense evidence here–despite Petitioner's representations–was minimal, that it had a prejudicial or inflammatory nature, and that Petitioner was otherwise permitted to broadly cross-examine Samantha and present his defense that her accusations were not worthy of belief. In sum, the defense evidence could be excluded without violating Petitioner's right to present a defense or to confront witnesses.

Petitioner made his first evidentiary proffer of his defense theory at the pretrial hearing. Defense counsel explained that from the time the complainant was fifteen years old, she had consensual sex with Steven, who was three or four years older than her. He noted that the existence of this relationship was known by Samantha's mother, friends, and uncle. Defense counsel stated that Petitioner confronted the complainant about the relationship and warned her that if she did not stop having sex with Steven he would call the police. Dkt. 6-3, at 3-6. Conspicuously absent from this presentation were the dates and nature of Samantha's disclosure and the date of Petitioner's threat, which would have undermined the defense theory.

Petitioner elaborated on his theory of defense in his motion for new trial, which was supported by his own affidavit and the affidavit of Eric Sandmire. Petitioner said in his affidavit that he learned of Samantha's sexual relationship with Steven in the Summer of 2008, and that is when he told her (and Sandmire heard him say), "If you don't end it, I will, and he'll be in jail." Dkt. 2-2, at 6, 23-25. He alleges that the matter came to a head in October of 2008, when Petitioner refused to put her on his cell phone plan, at which point Samantha responded, "I have no use for you," and thereafter the allegations were made against him. Id.

This defense theory is surfacely compelling but only minimally probative. There are two chief problems with the defense narrative. First, the record shows that Samantha first accused Petitioner of assault in February of 2008–months before Petitioner threatened to end Samantha's relationship with Steven–when Samantha told her friend Olivia about the first assault. Dkt. 6-6, at 45, 88, 90.

The second problem is that Samantha did not run to authorities with her allegations in the supposed-effort to protect her relationship with Steven after the threat was made. Rather, she grudgingly revealed her allegations to adults after being prodded to do so by her friend. The record indicates that as the acts of molestation continued, Samantha later told her boyfriend Cody Hughs about them in October of 2008. Id., at 68-69. Two days afer telling Cody, she told Olivia about additional incidents, and Olivia then told her that she needed to tell someone else. The two girls then agreed to tell Olivia's mother. Id., at 72. Olivia's mother then took the girls to tell Samantha's mother. Id., at 73. Samantha told her mother, but told her that she did not want to tell anyone else. Nonetheless, her mother took her to her doctor. Id., at 73. After this appointment Samantha was taken to the police department. Id., at 74.

Olivia Rammage testified that when Samantha told her about the molestation, Samantha did not want anyone else to know. Dkt. 6-7, at 16. When Samantha told her in October of 2008 that Petitioner had continued to assault her, Olivia urged her to report it. Id., at 17. The two agreed to tell Olivia's mother, who would tell Samantha's mother. Id., at 18. This time-line is inconsistent with the conduct of a person leveling false charges with authorities in as act of retaliation.

Accordingly, the record of the disclosure of the allegations undercuts the defense theory that they were made in retaliation for Petitioner's threat against Steven. Samantha first told her friend about an incident months before the threat was made. Moreover, she did not report the molestation

to authorities; instead she told her friend in confidence. Months later, when Samantha made another disclosure, it was made to her boyfriend and friend, who prompted her to tell an adult. When she finally revealed what occurred to her own mother, Samantha maintained that she did not want to tell anyone else. Viewed in light of the record as a whole, the probative value of the excluded defense evidence was low.

On the other hand, the excluded evidence had an obvious "prejudicial or inflammatory nature." Samantha was sixteen years old at the time of trial. Evidence that she was engaged in a sexual relationship with a young man three or four years older than her while she had another boyfriend would have the inflammatory and prejudicial tendency to portray her as promiscuous. It would have seriously undermined her right as a child victim of sex abuse to privacy when, due to the timing and manner of her accusations, the evidence was not particularly probative.

Finally, Petitioner was otherwise allowed to fully cross-examine Samantha and present his defense that the allegations against him were fabricated. Defense counsel was allowed to show that Samantha's accounts of the abuse varied. Samantha testified that Petitioner first assaulted her in January or February of 2008. Samantha testified that the first incident happened when she was in Petitioner's home in Holly, Michigan. Dkt. 6-6, at 40-41, 83-86. She claimed that a second incident happened at the Holly home when her younger half-sister, Madison, was away visiting her grandmother. Id., at 41-44. She claimed a third incident, which involved full sexual intercourse, happened at a hotel in March or April of 2008, in a bathroom. Id., at 90-96. Samantha claimed that the fourth incident, also intercourse, happened at her uncle Donald Martin's house, at the end of the Summer of 2008, when both Don and his partner, Eric Sandmire, were present in the home. Id., at 52-59, 107-108. The fifth incident happened at her grandmother's house when her grandmother and her little sister were home. Id., at 59-62, 108-110. Finally, she claimed that the sixth incident,

another act of full sexual intercourse, occurred at her uncle's house after Petitioner tried to join her in the shower at the end of August of 2008. Id., at 63-65, 113-119.

Defense counsel attempted to show that the description of these acts varied significantly with what Samantha said during the forensic interview with Amy Allen. Samantha told Allen that "everything started once her father moved in with Uncle Don," which did not happen until the fourth incident described at trial. Samantha did not tell Allen anything about the two incidents occurring in January or February of 2008. Also in contrast to her trial testimony, Samantha told Allen that during the hotel incident, she was raped on the bed instead of in the bathroom, with her sister present just a few feet away instead of out in the hallway. Also in contrast to her trial testimony with respect to the last incident, Samantha testified at preliminary examination that the incident stopped when her sister called. Id., at 116-118.

Moreover, defense counsel cross-examined Samantha about the fact that she continued to willingly stay with Petitioner despite the fact he was sexually assaulting her. Samantha testified that while the incidents made her uncomfortable, she nevertheless continued to stay over with Petitioner all the time, and given the choice of going to her father's house alone, or going to her grandmother's house, she chose to go to Petitioner's. Defense counsel elicited testimony from Samantha that she preferred to stay with Petitioner, who was abusing her, to spending time with her younger sister because her sister would get her in trouble with her grandmother. Id., at 127, 134-135.

Furthermore, Samantha testified on direct examination that she decided to disclose the molestation to protect her little sister, "so that my sister wouldn't have to go through the same thing." Id., at 71. But on cross-examination she admitted that even after Petitioner started to molest her, she went to court to testify on his behalf to get a personal protection order lifted that had prevented her father from being with Madison. Id., at 137-138.

Defense counsel also challenged the credibility of Samantha through defense witnesses. Defense counsel elicited the testimony of Eric Sandmire, the domestic partner of Don Martin, that Petitioner moved into his house in February of 2008 when Petitioner was going through a divorce. Dkt. 6-7, at 111-12. Sandmire confirmed that Samantha visited frequently. Id., at 112-113. He testified that though Samantha had the choice of sleeping alone on the couch, she found it uncomfortable and instead chose to sleep in a bed with Petitioner. Id., at 124. Sandmire testified that Petitioner went to bed early, and that he was frequently already in bed or asleep when Samantha would join him. Id., at 125-28.

Sandmire also testified that he did not notice any change in Samantha's mood between February and September of 2008. Id., at 113-14. He testified that she had a temper and would have tantrums if she did not get her way. Id. Sandmire testified that he was present when Samantha and Petitioner had a conversation about her cell phone in early October of 2008. Id., at 116-117. Petitioner told Samantha that he was hesitant to get her a new phone. Id., at 117. The conversation ended when Samantha hung up on Petitioner, and the next day was when she told someone at school that Petitioner molested her. Id., at 118, 133.

Defense counsel was also able to use the testimony of Petitioner's brother, Don, to establish his defense. Don Martin confirmed that Samantha continued to visit Petitioner about every other weekend during the relevant time period, and she came over whenever she wanted. Id., at 138. Before Don and Sandmire bought beds for the two girls in August of 2008, they would sleep on the couch or in Petitioner's bed. Id., at 145. Don testified that he did not notice any change in Samantha's demeanor or personality during 2008. Id., at 139. He testified that if she did not get her way she would get very angry and upset. Id., at 140. He did not see any signs that would indicate that Samantha was being molested. Id., at 144-145.

Finally, defense counsel called Petitioner's girlfriend, Jennifer Clauson, as a defense witness. Dkt. 6-8, at 4. Clauson testified that Samantha's relationship with Petitioner seemed to be very close. Id., at 6. Clauson recalled an incident in September of 2008 when Samantha sat on Petitioner's lap, put her arm around him, kissed him on the cheek and said, "I love my daddy, he's so cute." Id., at 8.

Where, as here, a criminal defendant is permitted to admit evidence undermining the credibility of a witness or complainant, but is precluded from presenting specific statements protected by application of an evidentiary rule, the limitation usually "does not rise to a violation of the Confrontation Clause." *Couturier v. Vasbinder*, 385 F. App'x 509, 515 (6th Cir. 2010); see also *Wiecek v. Lafler*, 417 F. App'x 443, 447 (6th Cir. 2011). Defense counsel was afforded much leeway to impeach Samantha's credibility. He did this by noting inconsistencies in the allegations, by showing that she voluntarily stayed with Petitioner and chose to sleep in his bed despite his conduct, acted in other ways that were inconsistent with being molested, that she was prone to tantrums if she did not get her way, and that she became angry with Petitioner the day before she disclosed the molestation because Petitioner would not get her a new phone. On this record, the Court finds that the jury "had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989).

The Court reiterated that the probative force of the precluded defense evidence was quite minimal given the fact that Samantha first disclosed the molestation before Petitioner threatened to disclose her relationship with Steven, and by the fact that she was reluctant to disclose the abuse to anyone other than her friend and boyfriend. Samantha did not go to the authorities to get her father in trouble as the defense narrative suggested; rather she confided in friends who urged her to tell one

of her friend's mother. From there adults took Samantha to the doctor and then to the police.

The Court finds that Petitioner failed to demonstrate that his right to confront witnesses or to present a defense were violated by the exclusion of evidence that Petitioner threatened to go to police to report her sexual relationship with Steven.

C. Ineffective Assistance of Counsel

Petitioner raises four allegations of ineffective assistance of trial counsel. A violation of the Sixth Amendment right to effective assistance of counsel is established where an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Even on direct review, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotes omitted)).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a

breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

"The standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted).

1. Failure to Renew Motion to Present Defense Evidence

Petitioner's primary allegation is that her counsel was ineffective for failing to renew his motion to admit the defense evidence discussed above given that the trial court had reserved its ruling. The trial court suggested in its order denying Petitioner's motion for new trial that a renewed motion would have been denied. The Michigan Court of Appeals then found that the evidence was properly excluded under the rape shield law, and this Court has now found that admission of the evidence was not constitutionally compelled.

Counsel cannot be deemed ineffective for failing to raise a meritless motion. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006). Nor can Petitioner establish *Strickland* prejudice; a renewed motion to admit the evidence would have been denied. Even if it had not been denied, the fact that Samantha disclosed the abuse to her friend before Petitioner made his threat and the fact that others prodded Samantha to disclose the abuse to adults completely undermine the defense.

Petitioner's first allegation of ineffective assistance of counsel does not form a basis for granting habeas relief.

2. Failure to Secure Victim's Medical Records

Petitioner claims that his trial counsel was ineffective for failing to obtain Samantha's medical records. He also alleges that Dr. Gorman's testimony that Samantha identified Petitioner as the person who sexually assaulted her was improperly admitted under Michigan Rule of Evidence 803(4). The Michigan Court of Appeals rejected these allegations on the merits:

Martin further argues that defense counsel was ineffective for failing to challenge Dr. Gorman's claim that the complainant had reported that he was the perpetrator.

Defense counsel did not object when Dr. Gorman testified that the complainant identified Martin as her sexual assailant. However, the trial court concluded that the testimony was admissible since Gorman testified that it was necessary for medical diagnosis and treatment.[18] And such statements are deemed inherently trustworthy because of a patient's self-interest in receiving proper care.[19] Thus, even had defense counsel made the objection, the trial court would have denied it. And, as noted, futile objections are not required.[20]

FOOTNOTES

18 MICH. RULE EVID. 803(4); *People v. Meeboer*, 439 Mich. 310, 322 (1992).

19 *Meeboer*, 439 Mich. at 322-323; *People v. Crump*, 216 Mich.App. 210, 212 (1996).

20 *Davenport*, 286 Mich.App. at 199.

Martin also argues that defense counsel should have secured Dr. Gorman's medical records, as they may have identified an alternate source of the complainant's medical condition. We disagree. Regarding the medical records, the trial court noted that defense counsel had been given the medical record concerning the October visit. And Martin failed to show that a request for the earlier records would have been successful given their privileged nature. The issue was not whether the complainant had previously had sexual intercourse, but whether the evidence would have been admissible to support Martin's defense. Thus, because Martin has only offered speculation regarding how the records would have been relevant in that respect, counsel was not ineffective for failing to request the earlier medical records.

*Martin*, 2011 WL 445806, *15-16.

This decision was reasonable. In its order denying Petitioner's motion for new trial, the trial court made a finding of fact that, contrary to Petitioner's allegations, the medical records from the October appointment had been provided to defense counsel. A state court's factual determination is entitled to a presumption of correctness on federal habeas review. 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption, but only if he offers clear and convincing evidence that the factual determination was incorrect. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

Petitioner has not presented this Court with evidence, let alone clear and convincing evidence, that defense counsel did not have the medical records at issue.

Petitioner's argument is also based on unfounded speculation. Petitioner theorizes that Samantha must have identified a person other than him as having sexual relations with Samantha during her August doctor appointment. Dr. Gorman testified, however, that Samantha identified Petitioner as having molested her during the October appointment, and that the allegation was promptly reported to the authorities. Dr. Gorman did not testify that Samantha made any allegations of sexual activity during her August examination. Dr. Gorman merely testified that during the October examination Samantha stated that the last molestation by Petitioner happened in August, and that was the reason she did not feel it was necessary to perform another pelvic examination. Accordingly, Petitioner's statement that Samantha must have identified a different perpetrator in August, results from a misunderstanding of Dr. Gorman's testimony.

With respect to counsel's failure to object to Dr. Gorman's testimony that Samantha identified Petitioner, Petitioner cannot show that the trial court would have sustained an objection. The Michigan Court of Appeals found that the testimony was admissible as a matter of state law under Michigan Rule of Evidence 803(4) as interpreted in *People v. Meeboer*, 439 Mich. 310, 322 (1992). This Court may not second-guess that determination of state evidentiary law. Alleged errors in the application of state evidence law are not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). This is because the state courts are the final arbiters of state law. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). A state court's determination that a particular piece of evidence is or is not admissible as a matter of state evidentiary law is therefore binding on a federal habeas court. *See McGuire*, 502 U.S. 62, 67-68.

Accordingly, Petitioner's argument that his counsel should have objected to Dr. Gorman's testimony that Samantha identified Petitioner as the person who molested her is foreclosed by the state court's holding that the testimony was admissible.

3. Failure to Present Expert Testimony

Petitioner next asserts that his trial counsel was ineffective for failing to present an expert witness to rebut Allen's testimony regarding alternative hypotheses. Petitioner alleges that his threat to jail Steven is exactly the type of alternative hypotheses that should have been considered in a forensic interview, and he suggests that if Allen had been informed of those facts, the case might not have been referred for prosecution.

Petitioner attached an affidavit from Katherine Okla, a clinical psychologist, who states that in her opinion there "were multiple factors which undermine the reliability of the complainant's testimony in this case," and "there was information presented by the prosecution through expert witness testimony which should have been countered through a rebuttal witness for the defense." Okla Affidavit, p 2. The affidavit goes on to detail Okla's perceived problems with Allen's testimony.

The Michigan Court of Appeals rejected the claim:

According to Martin, his defense counsel was also ineffective because he should have consulted with an expert to assist in effectively cross-examining Allen and should have presented a defense expert to respond to her claim of no alternative hypothesis.

With his motion for a new trial, Martin attached a compelling affidavit from psychologist Katherine Okla, Ph.D. to support his claim that defense counsel should have secured an expert to counter Amy Allen's testimony and to assist with cross-examining her. In the opinion denying the motion, the trial court failed to address this aspect of Martin's motion.

In retrospect, it is possible that defense counsel could have secured a counter expert. Allen tended to undermine various bases for the argument that the

complainant's inconsistencies demonstrated a lack of truthfulness. While she did not say that the complainant was telling the truth, Allen explained the delay in reporting the abuse, gave an innocent reason for the inconsistencies in the complainant's testimony, and offered a plausible explanation for why the complainant may have voluntarily returned to Martin's home after suffering the abuse. However, ahead of trial, defense counsel may have legitimately thought that cross-examination would suffice. As previously noted, whether to call an expert witness is a matter of trial strategy, and this Court will not judge defense counsel's performance with the benefit of hindsight.[21] For these reasons, we conclude that Martin has not established ineffective assistance of counsel based on the failure to call an expert witness.

FOOTNOTES

21 *Payne*, 285 Mich. App. at 190.

*Martin*, 2011 WL 445806, *19.

The Michigan Court of Appeals reasonably rejected this claim. Petitioner is unable to overcome the strong presumption that counsel rendered adequate assistance and "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Although some attorneys may have called an expert witness to testify, that is not the test for habeas review. The Supreme Court stated that there are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. "It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it." *Harrington*, 562 U.S. at 106.

The state court noted that it was reasonable for Petitioner's trial counsel to rely on cross-examination to challenge Allen's testimony. In fact, as noted above, Allen conceded on cross-examination that she had no idea whether a particular child is flat-out lying about allegations of sexual abuse, and that she was expressing no opinion as to Samantha's truthfulness. Furthermore,

Petitioner's counsel used Allen's testimony to show inconsistencies between what Samantha told Allen and her later testimony. The decision by the state court that counsel was not ineffective for the way he dealt with Allen's testimony fell within the range of reasonable outcomes. Therefore, Petitioner has not demonstrated entitlement to habeas relief based on this claim.

4. Failure to Object to Inadmissible Hearsay

Petitioner alleges that his trial counsel should have objected to the admission of statements made by Samantha to other people regarding her allegations against Petitioner. The Michigan Court of Appeals rejected the claim on the merit:

> Finally, Martin contends that defense counsel was ineffective for failing to object on hearsay grounds to the complainant's alleged statements to others that Martin had molested her.
>
> We first note that these were not excited utterances. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[22] Although the passage of time is not conclusive, the focus is on the "possibility for conscious reflection."[23] Here, the complainant had such an opportunity for reflection during the approximately two-to three-month interval between the last instance of abuse and the statements she made to others.
>
> FOOTNOTES
>
> 22 MICH. RULE EVID. 803(2).
>
> 23 *People v. Smith*, 456 Mich. 543, 551 (1998).
>
> Nonetheless, the prosecution argues that these statements were made to explain the complainant's ensuing actions. That is, the statements the complainant made to her mother and godmother served as the catalyst for Amy Allen's ensuing investigation. Moreover, defense counsel could have made a tactical decision that nothing was to be gained by objecting to these statements. Accordingly, Martin has not established ineffective assistance of counsel based on the failure to object.

*Martin*, 2011 WL 445806, *18-19.

That Samantha made statements before trial that Petitioner molested her was not, in itself,

particularly damaging to his defense. Obviously, if she did told anyone about her allegations, there would not have been a prosecution. Se the fact that allegations were made before charges were pressed would be obvious to the jury.

Moreover, the Court's review of the record reveals that defense counsel used the prior statements by Samantha to show that she was not credible. He pointed to inconsistencies in her statements. Ironically, Petitioner's current counsel refers to some of these same inconsistencies to argue that the out-of-court statements were unreliable. For example, Samantha's friend testified that she told her in the Summer of 2008 that Petitioner had only touched her inappropriately, even though Samantha later alleged that she had been subjected to vaginal intercourse by that time. The prior statements seemed to work into Petitioner's defense that Samantha made-up the allegations and increased their intensity as time went on. The Court cannot conclude that defense counsel performed deficiently by using the prior statements to bolster his attack on Samantha's credibility instead of objecting to the introduction of the statements. Petitioner fails to demonstrate entitlement to relief on this claim.

D. Sentencing Guidelines

Petitioner's last claim is that the sentencing guidelines were scored incorrectly and were based on facts not admitted by him or proven beyond a reasonable doubt in violation of his Sixth Amendment right to a jury trial.

Petitioner's assertion that his sentence is invalid because the trial court incorrectly scored the state's sentencing guidelines fails to state a claim for federal-habeas relief because it is a state-law claim and non-cognizable. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (habeas-corpus relief does not lie for errors of state law) (*quoting Estelle* 502 U.S. at 67). *See also Austin v. Jackson*, 213 F.3d 298, 300-01 (6th Cir. 2000)(citation omitted).

With respect to Petitioner's claim that his sentence was based on facts not admitted by him or proven beyond a reasonable doubt, the argument is also unavailing. On June 17, 2013, the United States Supreme Court held that any fact which increases the mandatory minimum sentence for a crime is an element of the criminal offense that must be proven beyond a reasonable doubt. See *Alleyne v. United States*, 133 S. Ct. 2151, 2155, 186 L. Ed. 2d 314 ( 2013). *Alleyne* is an extension of the Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004), where the Supreme Court held that any fact that enhances a penalty for a crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. The Supreme Court in *Alleyne* overruled *Harris v. United States*, 536 U.S. 545 (2002), in which the Supreme Court had held that only factors that increase the maximum, as opposed to the minimum, sentence must be proven beyond a reasonable doubt to a factfinder. *Alleyne*, 133 S. Ct. at 2157-58. The Supreme Court emphasized that their ruling did not require that every fact which affects judicial discretion in sentencing must be proven to a jury beyond a reasonable doubt. *Id*. at 2163.

*Alleyne* does not apply to Petitioner's claim. The Supreme Court's holding in "*Alleyne* dealt with judge-found facts that raised the mandatory minimum sentence under a statute, not judge-found facts that trigger an increased guidelines range," which is what happened to Petitioner in this case. See *United States v. Cooper*, 739 F.3d 873, 884 (6th Cir. 2014); See also *United States v. James*, 575 F. App'x. 588, 595 (6th Cir. 2014) (collecting cases and noting that at least four post-*Alleyne* unanimous panels of the Sixth Circuit have "taken for granted that the rule of *Alleyne* applies only to mandatory minimum sentences."); *Saccoccia v. Farley*, 573 F. App'x. 483, 485 (6th Cir. 2014) ("But *Alleyne* held only that 'facts that increase a mandatory statutory minimum [are] part of the substantive offense.". . . It said nothing about guidelines sentencing factors . . . ."). The Sixth

Circuit, in fact, has ruled that *Alleyne* did not decide the question whether judicial factfinding under Michigan's indeterminate sentencing scheme violates the Sixth Amendment. See *Kittka v. Franks*, 539 F. App'x. 668, 673 (6th Cir. 2013).

Although the Michigan Supreme Court relied on the *Alleyne* decision in holding that Michigan's Sentencing Guidelines scheme violates the Sixth Amendment right to a jury trial. See *People v. Lockridge*, 498 Mich. 358 (2015), *Lockridge* does not provide a basis for habeas relief for petitioner. The AEDPA standard of review found in 28 U.S.C. § 2254 (d)(1) prohibits the use of lower court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law. See *Miller v. Straub*, 299 F. 3d 570, 578-579 (6th Cir. 2002). "The Michigan Supreme Court's decision in *Lockridge* does not render the result 'clearly established' for purposes of habeas review." *Haller v. Campbell*, No. 1:16-CV-206, 2016 U.S. Dist. LEXIS 35151, 2016 WL 1068744, at * 5 (W.D. Mich. Mar. 18, 2016). Because the Sixth Circuit ruled that *Alleyne* does not apply to sentencing guidelines factors, reasonable jurists at a minimum could disagree about whether *Alleyne* applies to Michigan's minimum sentencing guidelines. 2016 U.S. Dist. LEXIS 35151, [WL] at * 6. "*Alleyne* therefore did not clearly establish the unconstitutionality of the Michigan sentencing scheme and cannot form the basis for habeas corpus relief." *Id*.; See also *Perez v. Rivard*, No. 2:14-CV-12326, 2015 U.S. Dist. LEXIS 74211, 2015 WL 3620426, at *12 (E.D. Mich. June 9, 2015).

Because none of Petitioner's claims merit relief, the petition will be denied.

## IV. Certificate of Appealability

In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required

to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

The Court finds that jurists of reason could debate the Court's conclusion that Petitioner's right to present a defense claim and his first allegation of ineffective assistance of counsel is without merit. Petitioner was prevented for presenting some evidence that Samantha was motivated to falsely accuse him, and the trial court never expressly denied Petitioner's motion to present that evidence during trial. Despite the Court's opinion that they are without merit, the Court will neverthless grant a certificate of appealability with respect to these two claims. The Court denies a certificate of appealability with respect to his remaining claims; jurists of reason would not debate the Court's resolution of those claims.

V. Conclusion

The Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, and 2) **GRANTS** a certificate of appealability with respect to Petitioner's right to present a defense claim and his first allegation of ineffective assistance of counsel. The Court **DENIES** a certificate of appealability on the remaining claims.

**SO ORDERED.**

 /s/ Victoria A. Roberts
Hon. Victoria A. Roberts
United States District Judge

Dated: 8/14/17